## In re SHERLOCK HOMES OF W.N.Y., INC., d/b/a RE/MAX Sherlock Homes, Debtor.

### Mark S. Wallach, Trustee, Plaintiff,

v.

Elaine Nowak, Edward Church, RE/MAX Allstar Team Realty, Inc., Robert Anderson, Michael Battaglia, Susan Lawson, David J. Measer, Joanne Randles, Judith Serio, Janet Gambini, J. Gerard Green, Joni Korus, Constance Bridges, Ann Edwards, Louis Tavarella, Barbara Baker, Roberta Richeal, Defendants.

Bankruptcy No. 97–12949 B.
Adversary No. AP 97–1334 B.

United States Bankruptcy Court, W.D. New York.

Feb. 22, 2000.

wards, Louis Taravella, Roberta Richeal, & Michael Battaglia.

LoTempio & Brown, P.C. (Mary L. Slisz, Buffalo, New York, of counsel), for defendant, Judith Ann Serio.

Darrell A. Huckabone, Buffalo, New York, for defendants, Elayne Nowak, Edward Church & Re/Max Allstar Team Realty, Inc.

Bennett, DiFilippo & Kurtzhalts (Anthony DiFilippo IV, East Aurora, New York, of counsel), for defendant J. Gerard Green.

Blinkoff, Crowley & McBride (Michael M. Blinkoff, Kenmore, New York, of counsel), for defendant Joni Korus.

Goldstein, Bulan & Chiari (Harold P. Bulan, Buffalo, New York, of counsel), for defendant Barbara Baker.

William C. Moran & Associates, William C. Moran, of counsel, Williamsville, New York, for defendant Susan Lawson.

Randy H. Gugino, Amherst, New York, for defendant David J. Measer.

CARL L. BUCKI, Bankruptcy Judge.

In this adversary proceeding, the court must consider the rights and obligations of real estate salespeople who are affiliated with a licensed broker that files a petition for relief under Chapter 7 of the Bankruptcy Code. Although presented in the context of a complicated set of relationships, the underlying issues implicate only the same duties that arise in every bankruptcy proceeding.

Prior to the filing of its bankruptcy petition, Sherlock Homes of W.N.Y., Inc. ("Sherlock Homes"), had operated a real estate brokerage as a franchisee of RE/MAX of New York, Inc. Within the debtor's organization were a number of sales representatives, all of whom were licenced as either real estate salespersons or real estate brokers. Because the debtor was a corporation, New York law required that the brokerage office "shall be under the direct supervision of … a representative broker." N.Y.COMP.CODES R. & REGS., tit.

Penney, Maier, Wallach & Crowe (Mark S. Wallach, Buffalo, New York, of counsel), for plaintiff/trustee.

Bloom, Neubeck & Shonn, LLP (Eric A. Bloom, Buffalo, New York, of counsel), for Robert Anderson, Joanne Randles, Janet Gambini, Constance Bridges, Ann Ed-

19, § 175.20 subd.(b) (1999). For Sherlock Homes, that individual was Dorothy Borzillieri, the mother of the debtor's president, Joseph A. Borzillieri, Jr.

For some months prior to its bankruptcy filing, Sherlock Homes had encountered a number of legal, operational, and other problems. Dorothy Borzillieri died on December 7, 1996. The debtor was then unable to secure an extension of its franchise agreement, which by its terms was to expire on May 7, 1997. Joseph Borzillieri attempted but failed to negotiate a sale of the business to its office manager, Elayne Nowak, either individually or as part of a group. Meanwhile, some of the sales representatives heard reports of irregularities with respect to the debtor's escrow accounts. Amidst this uncertain environment, Mr. Borzillieri telephoned the debtor's bookkeeper on the morning of May 9, 1997, with instructions that the office was to be closed. Later in the afternoon, Borzillieri sent written notice to the office that he intended to place Sherlock Homes into bankruptcy. Then, at 5:06 P.M., the debtor filed its petition for relief under Chapter 7 of the Bankruptcy Code.

The claims in this adversary proceeding arise from events that occurred at or around the closing of the debtor's business on May 9, 1997. At that time, the debtor was party to several hundred listing contracts, whereby prospective sellers granted to the debtor an exclusive right to market their real property. When it became known that Sherlock Homes was closing its business, many of the individual brokers and salespersons met with Elayne Nowak at the debtor's premises to discuss options for servicing the debtor's clients. One of the listing contracts was set to expire on May 9. As to each of the other listing contracts that is now the subject of dispute, Nowak executed on behalf of Sherlock Homes a proposed agreement entitled "Mutual Termination of Multiple Listing Contract." Upon being signed by the sellers, these termination agreements would purportedly allow sales representatives to negotiate new listing contracts with the same sellers, but on behalf of other brokerage offices. As a consequence, approximately two hundred of the debtor's customers signed new agreements with RE/MAX Allstar Team Realty, Inc. ("Allstar"), a brokerage owned by Edward Church and with which Elayne Nowak now affiliates.

Seeking to recover the value of the listing contracts and damages resulting from their taking, the Chapter 7 trustee commenced this Adversary Proceeding against Elayne Nowak, Edward Church, RE/MAX Allstar Team Realty, Inc., and fourteen of the debtor's former sales representatives. The first cause of action alleges that any pre-petition transfer of a listing contract was without consideration, and is, therefore, avoidable as a fraudulent conveyance under 11 U.S.C. § 548. With respect to transfers that occurred after the bankruptcy filing, the second, third and fourth causes of action allege, respectively, that the defendants willfully interfered with property of the Bankruptcy Estate, that such transfers are void under 11 U.S.C. § 549 as an unauthorized post petition transaction, and that such transfers constitute a knowing violation of the automatic stay imposed by 11 U.S.C. § 362(a). Finally, in his fifth cause of action, the trustee urges that the claims of the defendants be equitably subordinated to the claims of other creditors. All of the defendants have now answered, and of these, thirteen have moved for summary judgment. In response, the trustee has cross moved against all defendants as to liability but not with respect to a determination of damages.

The defendants have filed five separate motions for summary judgment. Presenting the lead arguments are Nowak, Church and Allstar, who in their joint application have asserted twenty separate bases for a decision in their favor. Ten other defendants have adopted these points, but have augmented their positions with additional argumentation. Because

the same analysis will apply to more than one of the outstanding contentions, the court will examine the objections conceptually, rather than seriatim. In the view of this court, a resolution follows from consideration of three areas of analysis.

I. *As a party to the listing contracts, the debtor possessed contract rights that constitute property of its bankruptcy estate.*

■ Each of the listing contracts was simply an agreement between Sherlock Homes and a prospective seller. As such, it bestowed certain contractual rights upon the parties. The contract rights of Sherlock Homes under the listing contracts were, therefore, assets of the debtor. Section 541 of the Bankruptcy Code defines property of the estate generally to include "all legal or equitable interests of the debtor in property as of the commencement of the case." To the extent that a listing contract was in existence at the filing of the bankruptcy petition, the underlying contract rights were property of the estate.

In extensive affidavits, Nowak, Church and Allstar seek to explain the intricacies of the debtor's business operations. They assert that a RE/MAX franchisee is different from other real estate brokerages, in that it allows greater autonomy and independence to its sales representatives. Whereas other brokerages retain a comparatively high percentage of commissions to cover costs of overhead, the debtor charged rent to its representatives and allowed them a greater share of commission earnings. Memorializing this relationship were "Sales Associate Agreements," which in standardized form were signed by each sales representative and Sherlock Homes.

Although the characteristics of a RE/MAX franchisee may be a matter of some curiosity, they cannot compromise the fundamental nature of the listing contracts. Having only Sherlock Homes and the prospective sellers as parties, the listing contracts accorded no rights to any sales representative. Indeed, any other understanding of the relationship between Sherlock Homes and its salespeople might run afoul of applicable regulations that prohibit such salespeople from carrying on the business of a real estate broker.[1] Thus, the listing contracts created rights that would become assets of the debtor's bankruptcy estate. Confirming this view is paragraph 4A of the Sales Associate Agreements, which recites that the listings "shall become and remain the exclusive property" of Sherlock Homes.[2] Thus, no basis in fact exists for the defendants' assertion that the listing contracts were personal to the listing agents and that the listing agents were therefore at liberty to transfer the contracts to other brokerages.

■ The defendants further contend that upon termination of the RE/MAX franchise, Sherlock Homes lost its authority to conduct business. The invalidity of the debtor's franchise agreement might well affect a dispute involving a transfer of

---

1. N.Y.COMP.CODES R. & REGS. tit. 19, § 175.20 subd.(a), which in relevant part provides as follows: "A branch office shall not be conducted, maintained and operated under an arrangement whereby a licensed salesman or employee of the broker shall pay, or be responsible for, any expense or obligation created or incurred in its conduct, maintenance or operation, or under any other arrangement, the purpose, intent or effect of which shall permit a licensed salesman or employee to carry on the business of real estate broker for his own benefit, directly, or indirectly, in whole or in part."

2. The language of paragraph 4A assigns ownership to "RE/MAX". From the context of the agreement, "RE/MAX" clearly refers to the debtor. Thus, the court rejects the defendants' assertion that ownership was intended to rest in the franchisor, RE/MAX of New York, Inc. The franchisor is not a party to the Sales Associate Agreements, and nothing in these agreements evidences an intent to place ownership into the name of any entity other than Sherlock Homes.

franchise rights, but it has no relevance to a taking of or interference with rights under the listing contracts. So long as it maintained a valid brokerage license, Sherlock Homes retained authority to conduct business, with or without any RE/MAX franchise. Having authority to conduct business, the debtor was further authorized to acquire and retain the listing contracts. For this same reason, the franchisor is not a necessary party to the present action.

II. *The disputed transactions constituted a transfer of contract rights from the debtor to the substituted broker.*

■ Although none of the defendants ever received an assignment of a listing contract, the various transactions collectively effected a transfer of the underlying contract rights. Prior to the events at issue, Sherlock Homes possessed an exclusive listing for the sale of real estate. The mutual termination of that exclusive right then enabled the sales representatives to negotiate a new exclusive listing with the prospective sellers, but on behalf of a different broker. The net result was a transfer of exclusivity rights from the debtor to a new party. It is the transfer not of contracts, but of contract rights, that is properly the subject of the trustee's complaint. That this was accomplished through a series of transactions can in no way diminish the occurrence of the transfer. For this reason, the court rejects the argument that upon execution of the termination agreements, the defendants were free to negotiate replacement listings with impunity. Rather, the execution of a new listing agreement is the very event that completed the transfer of the contract rights for which the trustee now seeks to recover damages.

The defendants rely upon language in paragraph 4A of the Sales Associate Agreements, that "upon termination, Seller shall have the option of allowing the terminating agent to take their listing with them." On the issue of liability, no significance can attach to this provision. Despite its language, the fact remains that the defendants caused a transfer of contract rights belonging to the debtor. As a consequence, the trustee was denied the opportunity to utilize the list of Sherlock Homes customers for the purpose of promoting a different exercise of the seller's option to authorize a transfer of the listing. That a seller would necessarily have exercised this option for the benefit of the defendants is a fact not proven and of relevance only to the issue of damages.

III. *The trustee enjoys rights that are independent of the possibility or ease of performance under the listing contracts.*

■ The defendants assert numerous arguments relative to enforcement of the listing contracts. Nowak, Church and Allstar contend that they are not parties to these agreements, and therefore are not bound to their terms. Further, they insist that necessary defendants should include both property sellers (by reason of being the obligors for commissions due under the listing contracts) and the Greater Buffalo Association of Realtors (by reason of its role in allowing a property to be listed with its multiple listing service). Various of the defendants contend that because no sales were generated from the listing contracts with which they were involved, there are no commissions to which the trustee may make claim. The common deficiency with these arguments is that the trustee seeks not to enforce the listing contracts, but to recover damages for wrongful interference with and the transfer of contract rights that arose under those listing contracts. These causes of action are simply not contingent upon either the identity of parties to the listing contracts or the outcome of performance under the listing contracts.

■ Contract rights are assets of the estate, even when those contract rights would have had limited or even no value to

the debtor itself. For this reason, the court rejects various permutations to the argument that impossibility of performance under the listing contracts is a defense as to liability for interference with or transfer of contract rights. For example, Nowak, Church and Allstar argue that the earlier termination of the RE/MAX franchise and other licensing problems rendered the debtor unable to fulfill the duties of listing broker; that the debtor was incapable of serving as broker after its bankruptcy filing; that the debtor had materially breached its contracts with the sales associates, thereby impairing its ability to perform the obligations of broker; and that many of the listing contracts were of short duration with little value to the estate in any event. Admittedly, such factors might impact adversely upon the level of damages. The present motions, however, relate only to the question of liability. At stake is the potential value of listing contracts not to the debtor, but to the bankruptcy estate. For example, might a trustee be able to assign for value the contract rights from which the debtor was itself unable to profit? Even if these contracts could not be assigned under 11 U.S.C. § 365, might they have provided a customer list that could have been sold to a competing brokerage? By impairing the trustee's opportunity to explore these possibilities, a defendant subjects itself to the potential for liability.

The defendants argue that the debtor was not properly licensed at the time of the bankruptcy filing, that licensing defects rendered the listing contracts invalid, and that consequently there existed no asset of the estate against which the conduct of the defendants might impact. As to the inadequacy of licensing, the defendants point to an alleged failure to designate a new representative broker after the death of Dorothy Borzillieri. Although a "representative broker" must supervise each brokerage office, see N.Y.Comp.Codes R. & Regs., tit. 19, § 175.20 subd.(b) (1999), the defendants have cited no provision of any statute or regulation that would condi-

tion a license's continued validity upon any written designation of the identity of that representative broker. As licensed brokers, either Joseph A. Borzillieri, Jr., or Elayne Nowak were qualified to fulfill that function. That neither name was ever reported to New York State would appear to be an oversight of no consequence. The fundamental fact is that the debtor possessed a brokerage license as of the filing of its bankruptcy petition. Implicitly acknowledging the existence of this license is a proceeding that the Division of Licensing Services of the New York Department of State would commence more than one year after the bankruptcy filing, for the purpose of revoking that license. As the holder of a brokerage license, the debtor was a proper party to the listing contracts, and accordingly was entitled to their benefit.

### Outcome of Outstanding Motions

Having benefit of the foregoing analysis, the court can now resolve the various cross motions for summary judgment.

The first and third causes of action essentially complement one another. Whereas the first cause of action is brought under 11 U.S.C. § 548 to avoid any pre-petition transfers, the third cause of action seeks to enforce the trustee's power under 11 U.S.C. § 549 to avoid any post-petition transfers. Among the various defendants, however, only Allstar has been identified as a party to any of the new listing contracts. Not being a transferee of any contract rights, the other defendants have no liability under either section 548 or section 549. As to Allstar, a distinction is to be drawn between those transfers of listing contracts that occurred pre-petition, as opposed to those that were completed after the debtor's bankruptcy filing. With exceptions not here relevant, section 549 allows a trustee generally to avoid any transfer of an estate asset "that occurs after the commencement of the case," and without authorization. Because this court never authorized a transfer of the debtor's interest in the listing con-

tracts, Allstar is liable on the third cause of action to account for the value of any such contract whose release was finalized after the bankruptcy filing. In contrast, a claim under section 548 to recover pre-petition transfers will additionally require proof that the debtor "received less than a reasonably equivalent value in exchange for such transfer...." 11 U.S.C. § 548(a)(2)(A) [renumbered in 1998 as § 548(a)(1)(B)(i)]. Prior to any pre-petition transfers, the listing contracts imposed various obligations upon Sherlock Homes. The issue becomes whether the contract rights have a value that is reasonably equivalent to the value of the corresponding release of obligations. This being an unresolved issue of fact, the court will require a trial on the liability of Allstar under the first cause of action. Accordingly, with respect to liability under the first and third causes of action, the court will grant summary judgment to each defendant other than Allstar. The trustee's motion for summary judgment on the third cause of action is granted as against Allstar, but the cross motions of the trustee and Allstar with regard to the first cause of action are denied.

With respect to liability under the second cause of action for post-petition interference with contract rights and the fourth causes of action for violation of the automatic bankruptcy stay, the court will grant summary judgment to the trustee as against each of the defendants other than Joni Korus, will grant Korus's cross motion for summary judgment, and will deny the cross motions by each of the other defendants. Korus presents a special case, in that her involvement was limited to the listing that expired by its own terms on the day of bankruptcy filing. Thus, as to that listing, the bankruptcy estate retained no interest to which the trustee could assert a claim. Except to the extent that they were transferred pre-petition, the other listing contracts and all associated contract rights were property of the debtor's estate as defined by 11

U.S.C. § 541(a). The filing of a bankruptcy petition imposes an automatic stay that extends broadly to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Among the purposes of this stay is to afford a trustee sufficient opportunity to evaluate and administer estate assets. The defendants urge that the release of the listing contracts was necessitated by a number of exigencies, including a broker's duty to the owners of the listed property. Such considerations, however, are the basis not for self help, but for an application upon notice to the trustee for abandonment or stay relief. Bankruptcy courts are well equipped to give prompt consideration to such requests. Far more difficult is the task that this court will hereafter face, when it must ascertain damages for the failure to secure judicial approval. With the exception of Joni Korus, each of the defendants participated either in the procurement of releases or in the execution of new listing agreements with Allstar. To the extent that such conduct occurred post petition, the defendants violated the automatic stay, as alleged in the fourth cause of action, and further interfered willfully with the contract rights of the debtor, as alleged in the second cause of action.

With respect to liability under the fifth cause of action for equitable subordination of any allowable claims held by the defendants, the court will grant the motion of Joni Korus for summary judgment, but will otherwise deny all of the other motions. Because Korus's listing expired by its own terms, the court finds no evidence of any inequitable conduct on her part. With respect to the other defendants, the trustee's cause of action is an inherently equitable proceeding. As such, it anticipates a weighing of improprieties and the balancing of any wrongful conduct against the bona fides of the creditor's claim. Until the presentation of all evidence, including evidence of damages, with

respect to the other causes of action, the court is not positioned to decide the relative merits of these considerations.

The court is not unsympathetic to the individual sales representatives and brokers, or to their sense of fiduciary obligation to the debtor's clients. The simple truth, however, is that the listing contracts were agreements between sellers and the debtor, and to which none of the defendants were parties. To the extent that any defendant had concerns for the servicing of those accounts, he or she could have applied to this court for guidance or appropriate relief.

The court has considered all of the issues presented in the various pleadings. Any argument not herein addressed is either rejected or not materially relevant. In light of the rulings contained in this decision, the primary issue at trial will be the value, if any, of the debtor's interest in the listing contracts. Relative to the cause of action under section 548 of the Bankruptcy Code, this value is critical to the trustee's proof of inadequate consideration for the pre-petition transfer of contract rights to Allstar. As to all of the trustee's remaining claims, this value is the central component of damages. Absent a showing of the fair market value of the contract rights that were ultimately transferred, the non-punitive damages may be nominal or limited primarily to the trustee's cost of litigation. A second but related issue for trial is the allocation of damages. In granting summary judgment as to various issues of liability, the court has distinguished between pre and post petition events. Before damages can be assigned to any particular defendant, the trustee must establish which transfers will fit into either of these categories. At this time, it suffices to note that any release of a listing contract would be effective only upon the signature of both sellers and the debtor. The operative issue, therefore, is whether both consents had occurred prior to the moment of bankruptcy filing at 5:06 P.M. on May 9, 1997.

The outstanding motions for summary judgment are resolved as indicated herein. By separate communication, the court will schedule a further pretrial conference to establish a timetable for completion of discovery.

So ordered.